UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | | |
|---|---|---|
| JAMIE R. GREEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:19-cv-00481-JRS-MG |
| | ) | |
| RAJOLI, et al. | ) | |
| | ) | |
| Defendants. | ) | |

**Order Granting in Part Defendants' Motions for Summary Judgment, Dismissing State-Law Claims, Denying All Other Pending Motions, and Directing Entry of Final Judgment**

Indiana inmate Jamie Ray Green brought this suit alleging that Officer Richard Goodman used excessive force against him. Mr. Green also sued eleven other defendants—ranging from Officer Goodman's supervisor to prison medical providers to the Commissioner of the Indiana Department of Correction—for deliberate indifference, failure to protect, and retaliation. Some of those defendants were dismissed at screening. Those remaining, including Officer Goodman, have moved for summary judgment. Because video evidence debunks Mr. Green's allegations of excessive force, and because there is no genuine dispute of material fact as to his other federal claims, the defendants' motions for summary judgment must be **granted** as to those claims. The Court declines to exercise supplemental jurisdiction over Mr. Green's state-law claims.

## I. Summary Judgment Standard

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the assertion citing to particular parts of the record.

Fed. R. Civ. P. 56(c)(1)(A). A party may also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(B). Inadmissible evidence, including hearsay, cannot be used to support or defeat a summary judgment motion. *Cairel v. Alderden*, 821 F.3d 823, 830 (7th Cir. 2016); Fed. R. Civ. P. 56(c)(4). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed. Fed. R. Civ. P. 56(e).

The movant is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-movant. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The Court views the record in the light most favorable to the non-movant and draws all reasonable inferences in that party's favor. *Skiba v. Illinois Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018). The Court cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). But the Court need not—indeed, should not—accept a nonmovant's account of events if that account is "blatantly contradicted" by video evidence. *Scott v. Harris*, 550 U.S. 372, 379−80 (2007); *Williams v. Brooks*, 809 F.3d 936, 942 (7th Cir. 2016).

## II. Relevant Evidence

Mr. Green's claims stem from two interactions with Officer Goodman. In the first, Officer Goodman tried to close Mr. Green's cuff port—a small metal opening in the door of the cell—while Mr. Green held it open. In the second, Officer Goodman pulled on a leash attached to Mr. Green's handcuffs. Both events were captured by security cameras. Mr. Green brings several other claims based on the fallout from his interactions with Officer Goodman. These include claims

of failure to protect, retaliation, and deliberate indifference to a serious medical need. The Court will outline the evidence related to each set of claims in turn.

### A. Officer Goodman's Uses of Force

#### 1. The cuff port

On August 3, 2019, Mr. Green was inside his cell with the cuff port open, waiting to receive his food tray, when he saw Officer Goodman. Dkt. 99-4 at 18, 67:9−14 (Green deposition). The two had a disagreement about Mr. Green's shower privileges, and Officer Goodman attempted to close the cuff port door. *Id.* at 18, 67:19−68:9. By Mr. Green's account, Officer Goodman "grabbed ahold of the cuff port and started smashing [his] hands." Dkt. 115-1 at 41 (Green affidavit). Mr. Green pushed back, but Officer Goodman kept pushing and smashing his hands. *Id.*

The video shows a different story. Officer Goodman approached Mr. Green's cell, and they spoke for about twenty seconds. Video Ex. A (8/3/19) at 2:27−2:46.[1] About ten seconds in, Mr. Green gripped the cuff port door—which lays horizontal outside the cell when open—with his right hand. *Id.* at 2:36−2:41. He released the grip about five seconds later and rested his right fingers just inside the cuff port. *Id.* at 2:41−2:44. He then withdrew his fingers from the cuff port altogether before Officer Goodman closed the door. *Id.* at 2:44−2:46. Officer Goodman closed the cuff port door with his right hand, holding a set of keys in his left. His posture was relaxed, and the door closed smoothly. *Id.* at 2:45−2:46. The door was closed for a beat before Officer Goodman started to switch the keys to his right hand, apparently planning to lock the cuff port door. *Id.* at 2:46−2:47. As Officer Goodman's weight shifted away from Mr. Green's cell, Mr. Green shoved the cuff port door back open. *Id.* at 2:48. Officer Goodman shifted his weight back and struggled

---

[1] Mr. Green apparently viewed video from August 3 that displayed the date and time. The video provided to the Court does not include this information. This Order refers only to the time lapsed from the beginning of the video in the record, not the time of day.

for about two seconds to close the door, but Mr. Green held it open with both hands. *Id.* at 2:48−2:50.

When Officer Goodman let go and walked away, both of Mr. Green's hands still gripped the cuff port door. *Id.* at 2:50. Mr. Green's right hand remained resting on the cuff port door for several seconds. *Id.* at 2:50−3:00. Mr. Green then stepped away and retuned with paper and pencil. *Id.* at 3:01.[2] Mr. Green used his right hand to write for several seconds. *Id.* at 3:01−3:08. When Officer Goodman returned with defendant Officer Manley, Mr. Green pulled his hands from the cuff port door and Officer Manley closed it without further incident. *Id.* at 3:09−3:16.

### 2. The leash pull

On August 22, 2019, Officer Goodman and a female officer escorted Mr. Green to his cell, with the female officer holding a leash attached to Mr. Green's handcuffs. Video Ex. B (8/22/19) at 10:19:25−10:19:52. Mr. Green entered his cell, waited for the door to close, and backed up to slide his hands through the cuff port. *Id.* at 10:19:29−10:19:38. Mr. Green asserts that Officer Goodman then "yank[ed] on the leash for no reason" and "yank[ed] his arms out the door." Dkt. 99-4 at 21, 79:21−80:4 (Green deposition).

Once again, the video contradicts Mr. Green's story. After Mr. Green's cell door closed, several feet of leash remained inside the cell. *See* Video Ex. B (8/22/19) at 10:19:29−10:19:40. Before removing Mr. Green's handcuffs, Officer Goodman pulled some of the leash back through the cuff port. *Id.* at 10:19:38−10:19:40. He pulled the first bit of length with no trouble, but then

---

[2] Several minutes of footage appears to be missing from the video immediately before Mr. Green can be seen writing. *Compare* Video Ex. A (8/3/19) at 2:50−3:10 (showing Officer Goodman leaving and then returning with Officer Manley less than 20 seconds later), *with* dkt. 115-1 at 34−35 (Green "Summary of Video Evidence") (indicating that Officer Goodman left around 11:13 a.m. and returned with Officer Manley around 11:19 a.m.). None of the parties asserts that anything relevant to the case happened during this time.

the leash hesitated. *Id.* With a quick tug, he pulled the rest of it through. *Id.* This process exerted no apparent force on Mr. Green's hands, which remained still in the cuff port throughout. *Id.* Once the excess leash was out of Mr. Green's cell, Officer Goodman removed the handcuffs and closed the cuff port. *Id.* at 10:19:40−10:19:51.

### B. Medical Treatment

Mr. Green testifies that after the August 3 cuff port incident, he asked both Officer Goodman and Officer Manley for medical assistance, but neither one arranged for it. Mr. Green's hands were bleeding and had blisters. Dkt. 99-4 at 6, 19:9−11 (Green deposition). That evening, Mr. Green told defendant Nurse Courtney Landis about his hands. She saw his hands but did not examine them or remove Mr. Green from his cell. *Id.* at 7, 22:19−24. She instead told him to submit a healthcare request form. Dkt. 99-3 at 3, ¶ 10 (Landis affidavit).

Another nurse examined Mr. Green's hands two days later. She observed "superficial injury to [his] skin," including small blisters on the sides of his hands and redness on his knuckles. Dkt. 99-1 at 37−38 (medical records). Mr. Green told the nurse he just "wanted it to be reported." *Id.* at 38.

Defendant Dr. Rajoli treated Mr. Green's hands on August 9. *Id.* at 3. Mr. Green believed he would be getting an x-ray that day, but he did not. Dkt. 99-4 at 8−9, 29:13−31:18 (Green deposition). Instead, Dr. Rajoli inspected the hand without touching it and told Mr. Green the hand was not fractured. *Id.* at 9, 33:18−22. Dr. Rajoli observed no swelling, and Mr. Green said it had subsided. Dkt. 99-1 at 3. Dr. Rajoli diagnosed a mild sprain and provided a Toradol injection for Mr. Green's reported pain. *Id.* at 4; dkt. 99-2 at 2, ¶ 7 (Rajoli affidavit). Mr. Green received an x-ray on August 20, and it revealed no fracture or dislocation. *See* dkt. 104-1 at 71, ¶ 17 (Green

5

affidavit Nov. 11, 2020); dkt. 99-4 at 14, 51:22−25 (Green deposition) (acknowledging that x-rays "show[ed] no dislocation or fracture").

Mr. Green testifies that at the August 9 appointment, Dr. Rajoli discontinued his Tylenol prescription for back pain. Dkt. 99-4 at 6, 21:18−25 (Green deposition). Dr. Rajoli denies that he discontinued any medication, and he notes that Mr. Green had an active prescription for Cymbalta both before and after the appointment. Dkt. 99-2 at 2−3, ¶¶ 7−8 (describing Cymbalta as "an FDA-approved pain medication").

Nurse Landis and Dr. Rajoli worked for defendant Wexford Health Services of Indiana, LLC. Mr. Green testifies that Wexford failed to properly train them. Dkt. 99-4 at 10, 37:16−17 (Green deposition).

### C. Grievances, Retaliation, and Failure to Protect

Immediately after the cuff port incident, Officer Manley told Mr. Green to "let it go," or he would ensure that Mr. Green faced punishment. *Id.* at 19, 70:25−71:5. Mr. Green nevertheless submitted a grievance alleging excessive force by Officer Goodman. *Id*. at 15, 55:16−18. Five days after the incident, Officer Goodman searched Mr. Green's cell. Dkt. 115-1 at 42−43 (Green affidavit). Mr. Green asserts that Officer Goodman's search was retaliation for the grievance, and he testifies that defendant Sergeant Drada told him as much. *Id.* at 43. Mr. Green further testifies that Officer Manley threatened him for filing the grievance. *Id.*

Despite being on notice about the cuff port incident, neither Sergeant Drada nor Officer Manley took action to prevent Officer Goodman from interacting with Mr. Green again. *Id.* at 44.

### III. Discussion

Mr. Green's excessive force and failure to protect claims fail because the video evidence shows his allegations of force are severely exaggerated or downright false. The retaliation claims

6

fail because the alleged retaliation was in response to frivolous grievances asserting excessive force. And the medical claims fail because Mr. Green points to no evidence from which a reasonable jury could find deliberate indifference.

> **A.      Excessive Force and Failure to Protect**

Mr. Green alleges that Officer Goodman used excessive force against him by slamming his hands in the cuff port on August 3 and by yanking on the leash connected to his handcuffs on August 22. He further alleges that Officer Manley and Sergeant Drada failed to protect him from the second use of force after they learned about the first one.

The Eighth Amendment protects inmates from cruel and unusual punishment, including excessive force by prison officials. *McCottrell v. White*, 933 F.3d 651, 662 (7th Cir. 2019). This rule does not bar de minimis force unless the force is "'of a sort repugnant to the conscience of mankind.'" *Wilkins v. Gaddy*, 559 U.S. 34, 37−38 (2010) (per curiam) (quoting *Hudson v. McMillian*, 503 U.S. 1, 10 (1992)). Even if the force applied is not de minimis, it remains permissible if used "'in a good-faith effort to maintain or restore discipline.'" *McCottrell v. White*, 933 F.3d 651, 664 (7th Cir. 2019) (quoting *Wilkins*, 559 U.S. at 37). But malicious or sadistic force—even if it does not cause a serious injury—is prohibited. *Id.* To distinguish between good-faith and malicious force, courts consider a number of factors, including

> (1) the need for the application of force; (2) the relationship between the need and the amount of force that was used; (3) the extent of injury inflicted; (4) the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible officials on the basis of the facts known to them; and (5) any efforts made to temper the severity of a forceful response."

*McCottrell*, 933 F.3d at 663; *see Whitley v. Albers*, 475 U.S. 312, 321 (1986).

The Eighth Amendment also requires prison officials to take reasonable measures to protect an inmate's safety. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). An official is liable for

failure to protect an inmate from violence if (1) the inmate was exposed to an "objectively serious" harm and (2) the official knew of but disregarded "an excessive risk to the inmate's health or safety." *Balsewicz v. Pawlyk*, 963 F.3d 650, 654 (7th Cir. 2020).

### 1. **The Cuff Port**

No reasonable jury could find that Officer Goodman's use of force on August 3 was anything other than de minimis. The video evidence trumps Mr. Green's assertions that Officer Goodman "slammed," "shoved," and "smashed" the cuff port door closed on his hands. Dkt. 99-4 at 18, 68:8−14 (Green deposition). Officer Goodman waited until after Mr. Green's hands were clear of the cuff port door before closing it. Video Ex. A (8/3/19) at 2:44−2:46. When Mr. Green shoved the door open, Officer Goodman shoved back to close it. *Id.* at 2:48−2:50. But Officer Goodman released the door after about two seconds and then walked away. *Id.* at 2:50−2:53. Afterwards, Mr. Green's hands showed no sign of injury. On the contrary, the hands rested calmly for several seconds before picking up a pencil and paper and beginning to write. *Id.* at 2:50−3:08.

Even if a reasonable jury could find that Officer Goodman's use of force was more than de minimis, Mr. Green cannot prevail under the *Whitley* factors. *See McCottrell*, 933 F.3d at 663 (listing factors). Mr. Green prompted the use of force by preventing Officer Goodman from closing and locking the cuff port door. Officer Goodman used no more force than necessary, and he relented after only two seconds instead of forcing the cuff port door closed on Mr. Green's hands. And although Mr. Green testifies that he experienced swelling, bleeding, and blisters on his hands, the video shows no injury or distress. *Cf. Fillmore v. Page*, 358 F.3d 496, 505 (7th Cir. 2004) (finding force was de minimis where inmate experienced "discomfort and sore wrists"). In short, any reasonable jury would find that Officer Goodman's actions were not malicious or sadistic and instead that he applied force in a good-faith effort to restore and maintain discipline.

2. **The Leash Pull**

Any reasonable jury would find that Officer Goodman's use of force on August 22 was at most de minimis. The video evidence disproves Mr. Green's testimony that Officer Goodman "yank[ed] his arms out the door." Dkt. 99-4 at 21, 79:21−80:4 (Green deposition). Indeed, it is unclear whether Officer Goodman applied any force at all to Mr. Green. He pulled on the leash attached to Mr. Green's handcuffs to get some of the leash out of Mr. Green's cell. Video Ex. B (8/22/19) at 10:19:38−10:19:40. But Mr. Green's hands remained still the whole time, including when Officer Goodman gave a quick tug to get the final bit of excess leash out of the cell. *Id.* Any force applied to Mr. Green was de minimis—and certainly not malicious or sadistic.

For similar reasons, Officer Manley and Sergeant Drada are entitled to summary judgment on the failure-to-protect claims. Mr. Green asserts that Officer Manley and Sergeant Drada failed to protect him from Officer Goodman after the August 3 cuff port incident, thereby allowing the August 22 leash pull to occur. *See* Dkt. 99-4 at 20, 75:22−76:2 (Green deposition). But as the video shows, Mr. Green was not exposed to an objectively serious harm on August 22. Officer Manley and Sergeant Drada cannot be liable for failing to protect him from a serious harm that never happened. *See Hoban v. Godinez*, 502 F. App'x 574, 578 (7th Cir. 2012) (no damages for failure to protect from an "unrealized attack").

B. **Retaliation**

Mr. Green asserts that Officer Goodman and Officer Manley retaliated against him for filing grievances after the cuff port incident.

The First Amendment protects an inmate from retaliation for filing nonfrivolous grievances. *Perez v. Fenoglio*, 792 F.3d 768, 783 (7th Cir. 2015). But frivolous grievances are another matter. *Gillis v. Pollard*, 554 F. App'x 502, 506 (7th Cir. 2014) ("Only nonfrivolous

9

prisoner's grievances against prison officials are protected by the First Amendment."); *Harris v. Walls*, 604 F. App'x 518, 521 (7th Cir. 2015) (prison officials "may punish inmates who file frivolous grievances"). Any grievance alleging that Officer Goodman used excessive force by smashing Mr. Green's hands in the cuff port door was frivolous and therefore not protected by the First Amendment. *See Gillis*, 554 F. App'x at 506 (where video evidence indisputably established that allegations in grievance were false, reasonable jury could not find that grievance was nonfrivolous). Officer Goodman and Officer Manley are therefore entitled to summary judgment on Mr. Green's retaliation claims.

### C.     Medical Needs

The Eighth Amendment protects prisoners from "unnecessary and wanton infliction of pain, which includes deliberate indifference to serious medical needs." *Knight v. Grossman*, 942 F.3d 336, 341 (7th Cir. 2019) (cleaned up). To survive summary judgment, Mr. Green must put forth evidence that would allow a jury to find (1) that he suffered from an objectively serious medical condition and (2) that the defendants were deliberately indifferent to his medical needs. Mr. Green alleges that Dr. Rajoli, Nurse Landis, Officer Goodman, and Officer Manley, were deliberately indifferent to his hand injuries. He alleges that Dr. Rajoli was deliberately indifferent to his back pain. And he alleges that Wexford failed to properly train Nurse Landis and Dr. Rajoli.

#### 1.     Hand Injuries

Mr. Green has failed to provide evidence that his hand injuries were an objectively serious medical condition or that the defendants were deliberately indifferent. He testifies that his hands bled, swelled, and had blisters after being closed in the cuff port. Dkt. 99-4 at 20, 75:22−76:2 (Green deposition). Dr. Rajoli diagnosed a likely moderate sprain of the right wrist. Dkt. 104-1 at 12 (medical records). These injuries do not constitute an objectively serious medical need. *See*

*Williams v. Stauche*, 709 F. App'x 830, 834 (7th Cir. 2017) ("scraped elbows, swollen cheeks, split lips, and lacerations not requiring stitches" are not objectively serious medical needs); *James v. Cartwright*, 659 F. App'x 888, 890−91 (7th Cir. 2016) (same for minor cuts and bruises); *Lockett v. Suardini*, 526 F.3d 866, 876 (6th Cir. 2008) (same for minor lacerations and sore fingers after prison official bent inmate's fingers backward).

Even if Mr. Green's hand injuries were a serious medical need, he has presented no evidence that would allow a reasonable jury to find deliberate indifference by any defendant. Mr. Green argues that Officer Goodman, Officer Manley, and Nurse Landis should have arranged for immediate medical treatment. But Mr. Green's superficial injuries, even if objectively serious, did not require urgent care. Mr. Green also argues that Dr. Rajoli should have ordered an x-ray. But Mr. Green later got an x-ray, and the results were negative. There is no evidence that Dr. Rajoli's decision to forego the x-ray was incorrect, let alone deliberately indifferent.

### 2. Pain Medication

Mr. Green alleges that when he saw Dr. Rajoli for his hand injuries, Dr. Rajoli discontinued his Tylenol prescription for back pain. Dr. Rajoli denies this, but the disputed question of fact is immaterial. Even assuming Dr. Rajoli discontinued the Tylenol prescription, Mr. Green points to no evidence from which a jury could find that the decision was deliberately indifferent. Mr. Green had another active prescription for Cymbalta to treat his back pain. Dkt. 99-2 at 2−3, ¶¶ 7−8 (Rajoli affidavit). And he provides no evidence that Cymbalta alone was less effective for treating his pain than Cymbalta and Tylenol together.

### 3. Failure to Train

To succeed on his claim against Wexford, Mr. Green would have to show that he received constitutionally inadequate medical care and that a Wexford policy or practice "was the 'direct

11

cause' or 'moving force' behind his constitutional injury." *Pyles v. Fahim*, 771 F.3d 403, 409−10 (7th Cir. 2014) (quoting *Minix v. Canarecci*, 597 F.3d 824, 832 (7th Cir. 2010)). Mr. Green has put forth no evidence from which a jury could find that he received constitutionally inadequate medical care, so Wexford is entitled to summary judgment. *See id.* at 412 ("Wexford cannot be held liable for damages because there is no underlying constitutional violation.").

### IV. State-Law Claims

With Mr. Green's federal claims resolved, the Court has discretion whether to relinquish jurisdiction over his state-law claims. 28 U.S.C. §1367(c). "[W]hen deciding whether to exercise supplemental jurisdiction, 'a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity.'" *City of Chi. v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173 (1997) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988)).

The presumption is that a district court will relinquish supplemental jurisdiction over pendent claims "if all claims within the court's original jurisdiction have been resolved before trial." *Lavite v. Dunstan*, 932 F.3d 1020, 1034−35 (7th Cir. 2019). That presumption may be rebutted "(1) when the statute of limitations has run on the pendent claim, precluding the filing of a separate suit in state court; (2) substantial judicial resources have already been committed, so that sending the case to another court will cause a substantial duplication of effort; or (3) when it is absolutely clear how the pendent claims can be decided." *Sharp Elec. v. Metro. Life Ins.*, 578 F.3d 505, 514 (7th Cir. 2009) (quotation marks omitted).

None of the above circumstances are in play here. The statute of limitations will not have run on Mr. Green's state-law claims, as both federal and state law toll the relevant limitations period when claims are pending in a civil action (except in limited circumstances not present here).

12

*See* 28 U.S.C. § 1367(d); Ind. Code § 34-11-8-1. The Court has not expended significant resources on the pending state-law claims, and the Court does not expect that the parties' efforts with respect to those claims in discovery and briefing will go to waste. And it is not absolutely clear based on the record before the Court how Mr. Green's state-law claims must be decided. Accordingly, this Court relinquishes supplemental jurisdiction over Mr. Green's state-law claims.

## V. Pending Motions

Mr. Green's motion to exclude his deposition testimony, dkt. [105], is **denied**. Mr. Green asserts that the Nurse Landis, Dr. Rajoli, and Wexford did not provide him the deposition transcript for review and signature. Dkt. 105 at 4. But Mr. Green does not identify any errors or omissions in the deposition transcript. He has therefore failed to identify any prejudice based on the failure to produce the transcript for review and signature.

Mr. Green's motion for sanctions merely rehashes Mr. Green's arguments against Officer Goodman, Officer Manley, and Lieutenant Drada before concluding that defense counsel made false representations to the Court. Dkt. 120 at 2−6. The Court finds no improper conduct by defense counsel. The motion for sanctions, dkt. [120], is **denied**.

Officer Goodman, Officer Manley, and Sergeant Drada's *ex parte* motion for *in camera review* of prison use of force policies, dkt. [92], is **denied** as moot.

## VI. Conclusion

The defendants' motions for summary judgment, dkts. [97] and [107], are **granted** as to Mr. Green's federal claims. The Court relinquishes supplemental jurisdiction over his state-law claims, which are **dismissed** without prejudice. Final judgment shall now enter.

**IT IS SO ORDERED.**

Date:  6/22/2021

JAMES R. SWEENEY II, JUDGE
United States District Court
Southern District of Indiana

Distribution:

JAMIE R. GREEN
269392
WABASH VALLEY - CF
WABASH VALLEY CORRECTIONAL FACILITY - Inmate Mail/Parcels
6908 S. Old US Hwy 41
P.O. Box 1111
CARLISLE, IN 47838

Douglass R. Bitner
KATZ  KORIN CUNNINGHAM, P.C.
dbitner@kkclegal.com

Michael J. Blinn
INDIANA ATTORNEY GENERAL
michael.blinn@atg.in.gov

Rachel D. Johnson
KATZ  KORIN CUNNINGHAM, P.C.
rjohnson@kkclegal.com

Samantha May Sumcad
INDIANA ATTORNEY GENERAL
samantha.sumcad@atg.in.gov